[Civ. No. 6934. First Appellate District, Division One.—April 5, 1930.]

THE MAGNAVOX COMPANY (a Corporation), Respondent, v. H. D. JONES, Appellant.

Kilpatrick & Goodman and Frank B. Graves for Appellant.

Fitzgerald, Abbott & Beardsley for Respondent.

McKENZIE, J., *pro tem.* — During the first week of September, 1926, a Mr. Osborne, who had done business with plaintiff, which is a corporation having seven directors, but was not a director or officer of plaintiff, called defendant's attention to the possibility of obtaining from plaintiff corporation an exclusive sales contract for Magnaray electric heaters, a product manufactured by plaintiff. In turn Mr. Osborne introduced defendant to Mr. Travers, who was a director and general sales manager for plaintiff. At this

meeting the proposition of Mr. Jones' obtaining an exclusive sales contract was discussed in a general way, and a few days later, at Mr. Travers' request, Jones went to Mr. Travers' office and then and there negotiations began in earnest regarding the exclusive sales contract. After the negotiations started there were three representatives of plaintiff that discussed the proposition with Jones, namely: Mr. Travers, sales manager; Mr. Steers, president, and Mr. Sperry, treasurer. All three were directors of the corporation. There were four other directors, but Jones had no dealings or talk with the others. After the first meeting the negotiations were mostly between Jones and Sperry. After several meetings, one at least of which was at the office of plaintiff's attorneys, it was agreed that the sales contract should include Magnalux lamps as well as Magnaray heaters. The two articles were to constitute one contract, but the attorney preparing the contract directed the attention of the parties to the difficulty of embodying the terms relating to the two articles in one document owing to the fact that the territory covered, the terms, discounts, etc., were so different. It was then agreed that the conditions and terms for the heaters would be set forth in one paper and the lamps in another. Whereupon, the two forms of contract, Defendant's Exhibits "A" and "B," were prepared. The entire controversy involved in this action centers around those exhibits and the actions of the parties concerning them.

Exhibits "A" and "B" on their face appear to contain all the terms and conditions of a very complicated exclusive sales agreement and it would take pages to quote them. We deem it only necessary to specifically direct attention to two of the provisions. In the first place, the contracts (and by this term we mean only the documents), show that the plaintiff was making a departure from maintaining its own sales organization in eight of the Pacific Coast states and British Columbia, and in lieu thereof was to sell for ten years to none other than defendant, who agreed to purchase a minimum quantity of each article, amounting to approximately $2,000,000 during the ten-year period. In the second place, the contract relating to Magnaray heaters provided: "17. Guaranty. Contemporaneously with the execution and delivery of this agreement, and as a part of the same transaction, distributor will furnish the manufac-

turer with a valid bond or other instrument of security satisfactory to manufacturer, guaranteeing and securing the performance by the distributor of his agreement to purchase the minimum quantities of heaters specified in paragraph 4 hereof and his agreement to pay for the same as herein provided. Said bond or instrument of security shall be satisfactory to manufacturer and in such form as the manufacturer shall prescribe and with such security, securities or guarantors as it may approve and shall be in the principal sum of fifteen thousand dollars ($15,000.00). This sum shall be increased to twenty-two thousand five hundred dollars ($22,500.00) on or before the expiration of the first year of said contract . . . '' The Magnalux contract contained a similar clause, except that the amount of the bond was $8,750.

Those proposed contracts, exhibits ''A'' and ''B,'' were handed Jones on September 18th, and two days later he signed both and left them with Mr. Travers at the office of the company to be signed by the corporation. Jones was told by Mr. Travers ''That the contracts would have to be referred to their board meeting, which was held every Friday, and they would be approved by the board and signed at that time.'' On September 21st, and after Jones had signed the contracts, Jones called at the company's office and told Mr. Sperry he could not get a surety company to go on his bond. From now on we will quote Jones' testimony only where there is a conflict. When Jones told Sperry he could not get a bond, the latter suggested he offer some other security. A contract of sale of real estate owned by Jones on which there was due $16,000 was discussed. Jones brought the real estate contract to Sperry, who made a copy of it so that an assignment could be prepared for approval, and then Jones took the original away and never returned it. A form of assignment was never prepared nor were the terms or conditions of the assignment agreed upon or discussed. On September 28th, Mr. Sperry told Jones the security was approved (how a security of this kind could be approved in the absence of an assignment containing terms and conditions is not explained), and for him to get his sales organization working as rapidly as possible. On the strength of Mr. Sperry's statement Jones claims he commenced ordering Magnaray heaters and

Magnalux lamps and spent considerable money in preparing to start business without having the contract signed by the corporation or making investigation as to the action of the board of directors. The only action of the board is contained in the following resolution: ''Minutes of the Directors' Meeting of the Magnavox Company held at the company's office on September 24, 1926, Present: President Frank M. Steers in the chair, Directors Folsom, O'Connor, Pridham, Sperry and Travers. Absent: Director Sullivan, Director Travers submitted to the Board drafts of two proposed contracts with Horace D. Jones who intends to form a company for distribution of High Duty Magnaray heaters and Magna-Lux lamps. The contracts for both heaters and lamps to be for ten years. The new company proposes to purchase the first year heaters to the amount of $60,000.00 increasing by a graduated scale until reaching in the fifth year the sum of $250,000.00 remaining at this amount during balance of term of contract. The new Company agrees to put up a bond in favor of The Magnavox Company equivalent to 25% of estimated purchases for the year. In regard to the lamps the new Company proposes to purchase a minimum of 35,000 lamps and put up a bond for 25% of their value. Territory to be covered in both cases includes California, Oregon, Washington, Idaho, Nevada, Arizona, Utah and a portion of Montana, and Province of British Columbia in the Dominion of Canada. Upon motion duly made, seconded, and carried unanimously, it was *Resolved:* That the President and Secretary be authorized to execute a contract with Horace D. Jones, covering High Duty heaters, also contract covering Magna-Lux lamps, these contracts substantially as now written. Seal of the Company. Signed and certified by F. V. Moulin, Secretary, The Magnavox Company.'' On October 4th, Jones not having furnished bonds or other security as provided for in the contracts, plaintiff withdrew its offer as embodied in the contracts.

In June, 1927, plaintiff brought suit to recover $686.69, the value of the goods bought by Jones during the negotiations, and defendant sought by way of cross-complaint to recover from plaintiff damages in the sum of $2,186.94 for expenses incurred in preparing to do business and $60,000 for loss of prospective profits. At the commence-

ment of the trial a rather indefinite stipulation was entered into concerning plaintiff's cause of action which we interpret as follows: "It is stipulated that certain articles were bought from plaintiff by defendant; that they have not been paid for; that disregarding the aforesaid dealings between the parties, the regular price of said wares is $686.69, and defendant owes plaintiff this amount unless the dealings between the parties effected a different price." When the evidence was concluded, the court, on motion of plaintiff, directed the jury to find for plaintiff in the sum of $686.69, and to find for cross-defendant on defendant's cross-complaint. The jury followed the court's instructions. This appeal is predicated on the court's so instructing the jury.

Mr. Jones testified that at all times it was contemplated by him and plaintiff that any contract they might enter into should be reduced to writing and signed by both parties. The contracts were never signed by plaintiff.

■ "To properly prove a contract claimed to be binding on the corporation, it should be shown that it was made on its behalf by someone who had authority to act for it. It must be shown that the officer was expressly authorized, or that the act was fairly within the implied powers incidental to his office, or that the corporation is estopped to deny his authority by reason of having accepted the benefit of the contract or otherwise. ■ Where the corporate seal is used there is, of course, a presumption of authority, but where the seal is not used, the authority must otherwise affirmatively appear." (6 Cal. Jur., p. 1095.) The contemplated contract was not such as is made in the ordinary course of business; Jones knew that its terms had to be approved by the board of directors. He never complied with the terms of the proposed agreement, but negotiated with one of the directors to have different terms substituted in the contract. When he was negotiating with Sperry, he knew that he, Sperry, had no authority to change the terms of the proposed contract without the approval of the directors. The board of directors never approved or ratified any change. In fact, defendant's whole case is predicated on the fact that Sperry misled him in regard to what the directors would do or had done. "Individual directors are not the corporation's agents, and it is well settled, that

declarations and admissions of individual directors, when not acting as a board, are not binding on the corporation, nor admissible as evidence against it, unless they were acting at the time as its authorized agents, and within the scope of their authority.'' (3 Fletcher's Cyc. Corp., sec. 2168.) ■ A single director, having no authority to act for the corporation otherwise than as a member of the board of directors, cannot bind it by ratification of an unauthorized contract; and knowledge and acquiescence of a minority of the board is not ratification. (4 Fletcher's Cyc. Corp., sec. 2188.) ■ The fact that Jones for four or five days bought goods of the value of a few hundred dollars from plaintiff on the strength of Sperry's assurance that everything was all right and to go ahead, was not the receipt by plaintiff of such benefit as would work an estoppel nor was it a ratification of Sperry's acts. Compared with the time the contract was to run and the amount of money involved, those transactions were negligible. The plaintiff promptly repudiated Sperry's unauthorized acts, if any. ■ We are not deciding in this opinion that Sperry did or said what defendant claims nor that what Sperry said if anything, warranted defendant in incurring expense until the contract was signed. The recitals and conclusions herein have only reference to the action of the trial court in directing a verdict in favor of plaintiff on defendant's cross-complaint, which we conclude it was justified in doing. There was but one proposed contract; notwithstanding it was to be evidenced by two documents, this contract provided that two bonds or other security in the sum of $15,000 and $8,750 respectively, satisfactory to plaintiff, were to be furnished by Jones. According to Jones' own testimony, he could not furnish a surety bond, which evidently was what he had in mind when negotiations started; and the very most that Jones did or attempted to do was to try and get, through an unauthorized agent, plaintiff to accept not only different surety but in a less amount; and this he never succeeded in doing. On October 4th the plaintiff told defendant it would go no further with the negotiations concerning the proposed original contract, owing to his financial inability. When he was told this, he did not then or at any later time offer to furnish the security provided for in the contract or any security. It is true there

is a conflict in the evidence concerning what statements were made by Sperry to Jones; but there is no conflict about Sperry's not having authority to act for the corporation or about Jones' knowledge of this fact.

It may be fairly inferred from the whole record that Jones abandoned the venture.

Concerning the trial court's action in directing a verdict against defendant on plaintiff's complaint for wares bought by defendant from plaintiff pending negotiations prior to the execution of the exclusive sales agreement, the record shows that the first order was given on September 21st. This was before defendant claims Sperry told him the directors had agreed to terms different from those contained in the contract, and furthermore Jones placed orders after the 4th day of October, when he was told negotiations concerning the proposed contract were ended. From this it appears that defendant commenced to buy from plaintiff before any controversy arose about the security and continued to buy after this particular contract had been discarded. The goods were sold at the prices specified in the contract, which were lower than regular prices. It is apparent when the parties began to buy and sell they anticipated the contract would be executed. Because the contract was not executed, owing to the fault of defendant, is no reason why the defendant should not pay for the goods he bought during the interim. Having in mind the stipulation concerning plaintiff's demand, the court was justified in directing this verdict.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.